# EXHIBIT 5

C.N.RAMACHANDRAN NAIR, J.

Spl. Jurisdiction Case No.3 OF 2006

Dated this the 4th day of December 2006

ORDER

Since respondents 1 and 2 have expressed difficulty to furnish Bank guarantee, registry is directed to receive the payment in the form of Bankers' cheque in favour of the Registrar General for the said amount. Registry will keep the amount in deposit pending further orders in the matter. Respondents 1 and 2 can make payment in the rupee equivalent of the dollar amount mentioned in the order at the prevailing rate. Time for payment is extended till 9th of this month. As and when amount is deposited in court, arrest of the vessel stand lifted and vessel can sale sail.

C. N. Ramachandran Nair, J.

/ True Copy /

Assistant Registrar

IN THE HIGH COURT OF KERALA AT ERNAKULAM

Present:

The Honourable Mr.Justice C.N.Ramachandran Nair

Monday   4 th  day of December, 2006/13th Agrahayana 1928

SPJC. No. 3/2006   R

PETITIONER:

Forbes Gokak Ltd., Indira Gandhi Road, W/Island,
Kochi-682 003, rep: by its Senior Manager,
Mr.Venikta Subramanian, aged 47 years, S/o.V.Mahadevan.

Vs-

RESPONDENTS:

1.  M.V."BLUE STAR" , a motor vessel flying the flag of
    St.Kitts and Nevis and registered at the port of
    Basseterre together with her hull, tackle, engines,
    machinery, apparel, equipment, stores, articles,
    things and other paraphernalia, presently lying in
    the port and harbour of Mumbai, rep; by its Master
    now within Indian Territorial waters,

2.  Novstar Shipping & Marine Service Co,LLC,
    PO.Box.39510, Dubai-U.A.E.

3.  The Deputy Conservator,
    Mumbai Port Trust, Mumbai.

*  Addl.R4 impleaded.

*Addl.R4: Superintendent of Customs, (Prev),
         M & P Wing, P.N.P.Jetty, Dharamtar Port,
         Shahabaj Post Poynad, Taluka-Alibag,
         Dist-Raigad, Maharashtra-402 106.

    is impleaded Addl.R4   as per order dtd.27.11.06 in
    IA.No.3694/2006.

    SPJC praying inter alia that in the circumstances stated
in the affidavit filed along with the SPJC the High Court be pleased
to arrest and detain the 1st respondent vessel until further orders
and direct the 3rd respondent to detain the 1st Respondent
MV 'Blue Star' now within the territorial waters of India and
berthed at Mumbai Port and not to permit the vessel from sailing out
of the port limits till the respondents 1 & 2 furnish security for
the amount of US $ 85,857.728 (Indian Rupees @ 45 per £ Rs.
pending the Petition, in the interest of justice.

    This petition again coming on for orders upon perusing the
petition and the affidavit filed in support of SPJC and this Court's
order dtd. upon hearing the arguments of
Advocate for the petitioner and M.M.Syam Kumar for R1 and R2 and
Mr.John Varghese   for Addl. R4, the court passed the following:

                                                P.T.O.

msv/-

# EXHIBIT 6

BEFORE THE HONOURABLE HIGH COURT OF KERALA, ERNAKULAM

Sp.J.C.No. 3 OF 2006

Forbes Gokak                                    Petitioner
Vs.
M.V. "Blue Star" & 2 ors.                       Respondents

COUNTER AFFIDAVIT OF RESPONDENTS 1&2

M/s. K.P.Vijayan    V.  135
V.M. Syamkumar   S.1018
C.B.Sumadevi    S 709
Kripa Elizabeth Mathews K367
Counsel for the  Respondents 1&2

BEFORE THE HONOURABLE HIGH COURT OF KERALA, ERNAKULAM

Sp.J.C.No. 3 OF 2006

Forbes Gokak
V/s.                                                    ,,    Petitioner
M.V. "Blue Star" & 2 ors.                              ,,    Respondents

I N D E X

| Sl. No. | Contents | Page Nos. |
|---|---|---|
| 1. | Counter affidavit of Respondents 1&2 | 1 to 9 |
| 2. | Ext.R2(A) A true copy of the Time Charter Party dtd.29.11.2005 | 10 to 21 |
| 3. | Ext.R2(B) A true copy of the tabulation of vessels damage during arrest at Dharamtar Anchorage | 22 |
| 4. | Ext.R2 ( C ) a true copy of an extract of the Deck and Engine Log Books of the vessel | 23 |
| 5. | Ext.R2(D) a true copy of an invoice raised for supply of Fresh Water. | 24 |
| 6. | Ext.R2(E) a true copy of the Fresh water Receipt | 25 |
| 7. | Ext.R2(F) a true copy of confirmation statement dtd. 30.11.2006 of the supplier, Kherkelba Marine Services | 26 |

Dated this the          day of January 2007.

Counsel for the Respondents 1&2

1

BEFORE THE HON'BLE HIGH COURT OF KERALA AT ERNAKULAM

Sp.J.C. No. 3 of 2006

Forbes Gokak Ltd.                           .. Petitioner
Vs.
M.V. "Blue Star" & 2 others                 .. Respondents

COUNTER AFFDAVIT FILED BY THE 1ST AND 2ND RESPONDENTS

I, A. Z. Mookhtiar, aged 45 yrs S/o Zainul Mookhtiar Indian inhabitant residing at De Sylva House, 1st Floor, 18, Chapel Road, Bandra (W), Mumbai – 400 050 do hereby solemnly affirm and state as follows:

1. I am the duly Constituted Attorney of the 2nd Respondent in the above Sp.J.C. I am aware of the acts of the case as revealed by records. I am competent to swear to the contents of this affidavit on behalf of the 1st Respondent also.

2. At the very outset it is respectfully submitted that these Respondents hereby challenge the very maintainability of the Sp.J.C. inter alia on the question of jurisdiction. This counter affidavit is filed by the Respondents raising the said specific ground of maintainability as a preliminary issue and seeking dismissal of the special jurisdiction case, vacating of the Order of Arrest dated 14th November, 2006 and seeking release and / or refund of the security put up by the Respondents. It is respectfully pray that this Counter affidavit being filed for the said limited purpose may not be treated as voluntary submission to the Jurisdiction of this Hon'ble Court.

3. The brief facts relevant for appreciating the issues raised in the present Counter affidavit are as under:

(a) The Petitioner has filed this Sp.J.C. purportedly raising a claim of United States Dollars 85,857,728 towards alleged supplies of bunkers to the 1st Respondent Vessel at the port of Khorfakkan. The ship m.v "Blue Star" and her Owners Novstar Shipping and Marine Services LLC., are admittedly foreign parties. On the Petitioner's own averments, it is apparent that the Vessel was at Mumbai discharging cargo into barges destined for Dharamtar at the time of institution of the present case and the Application of arrest. By

2

ex-parte Order dated 14th November, 2006, this Hon'ble Court ordered the arrest and or detention of the 1st Respondent vessel and permitted its release only on furnishing of a Bank Guarantee for USD 83,303.10 in favour of the Deputy Conservator, Mumbai Port Trust. Further a condition was imposed upon the Petitioner to furnish (within two days from the date of the Order) a Bank Guarantee in the sum of Rs. 5,00,000/- in favour of the Registrar General of this Hon'ble Court, to cover the loss and hardship to the Shipping Company in the event of the Petitioner failing to prove its case.

(b)     By a further Order dated 4th December, 2006 passed by this Hon'ble Court, the Order of 14th November, 2006 was modified to the extent that these Respondents were inter alia granted liberty to put up security in the form of Bankers cheque for the rupee equivalent of USD 83,303.10 in favour of the Registrar General of this Hon'ble Court and the Registrar General was directed to keep the amount in deposit pending further orders in the matter.

(c)     On 6th December, 2006, an Interim Application was moved for securing the release of the Vessel after depositing security by way of a Bankers cheque in the sum of Rs. 37,12,919.18 (being the rupee equivalent of USD 83,303.10 at the prevailing rate of 1 USD = Rs. 4- 57 p) in favour of the Registrar General of this Hon'ble Court by these Respondents without admission of liability and without prejudice to their rights and contentions, more particularly that this Hon'ble Court had no jurisdiction to entertain the present case, hat the Order of arrest is without jurisdiction and the purported claim of Petitioner is untenable in law.

(d)     By Order date 6th December, 2006, this Hon'ble Court was pleased to release the 1st Respondent Vessel from Arrest and direct the Registrar General of this Hon'ble Court to send communications to the Deputy Conservator, Mumbai Port Trust and the Commissioner of Customs, Mumbai about the compliance of interim order and the approval of this Hon'ble Court for release of the 1st Respondent Vessel.

4. At the outset, as and by way of a preliminary objection, it is respectfully submitted that this Hon'ble Court has no jurisdiction to entertain, try and dispose off the



3

present case. The Petitioner has averred in the Petition that at all material times, the 1ˢᵗ Respondent Vessel has been lying at the Port and Harbour of Mumbai. Hence, admittedly, the 1ˢᵗ Respondent Vessel has at all relevant times been outside the territorial jurisdiction of this Hon'ble Court. The Petitioners alleged cause of action i.e., supply of bunkers at the Port of Khorfakkan (a foreign Port), as also on the Petitioners' own averments (which are denied), has also allegedly accrued outside the jurisdiction of this Hon'ble Court. The 2ⁿᵈ Respondent is also an entity incorporated under Foreign Laws and is situated wholly outside India. In these circumstances it is respectfully submitted that since neither of these Respondents are situated within the jurisdiction of this Hon'ble Court nor has the cause of action arisen within the jurisdiction of this Hon'ble Court, this Hon'ble Court has no jurisdiction to entertain or try the present case.

5. In the aforesaid context, it is submitted that even under the Constitution of India, the High Court is empowered to issue writs, order and / or directions only throughout the territories over which it exercises jurisdiction. For a High Court to exercise admiralty jurisdiction it is a necessary pre-requisite (to found jurisdiction) that the Vessel is within the local limits of the concerned High Court at the time of initiation of proceedings. It is submitted that the exercise of Admiralty jurisdiction by a High Court is circumscribed and / or restricted to its territorial jurisdiction. This is also necessitated and / or demanded by public policy i.e. that the High Court must exercise jurisdiction including admiralty jurisdiction over territories in respect of which it has been established as otherwise it would result in a chaotic situation where various High Courts would exercise jurisdictions concurrently over all the territorial waters of India resulting in conflicting decisions.

6. Pertinently, in the present case, there is no dispute that both Respondent 1 and 2 against whom relief is sought are situated outside the jurisdiction of this Hon'ble Court. The alleged cause of action i.e., the purported supplies and / or alleged non-payment has arisen outside the jurisdiction of this Hon'ble Court. Hence, on the





4

Petitioner's own showing, it is apparent that this Hon'ble Court has no jurisdiction to entertain and try the case. The Special Jurisdiction case is therefore required to be rejected and these Applicants pray accordingly.

7. Without prejudice to the aforesaid, it is submitted that even otherwise the Petitioner's alleged claim is ex-facie untenable in law, this is for the following reasons :-

(e) The Petitioner's alleged claim is for payment of sum of USD 85,857.728 for bunkers allegedly supplied to the 1st respondent Vessel by its alleged physical suppliers i.e. Oil Marketing & Trading International LLC. (Oil Marketing). The Petition and the documents filed therewith, (Exhibit – P1) allege that the supply was effected at the request of one Cockett Marine Oil Ltd. (hereinafter referred to as Cockett Marine) allegedly the Agents of one Cross World M.E. U.A.E (hereinafter referred to as Cross World), who at the relevant time were the alleged Time Charterers of the 1st Respondent Vessel. Hence, on the Petitioner's own showing the supply of bunkers was not even made by the Petitioner, but by a third party i.e. the said Oil Marketing. The alleged Contract for the supply of bunkers is (without admitting) on the Petitioner's own showing, between the Petitioner and the said Cross World and / or Cockett Marine. In the circumstances, there is no Contract for the supply of bunkers with either the 1st Respondent Vessel and / or her Owners i.e. the 2nd Respondents. Consequently; (i) there is therefore admittedly no privity of Contract between the Petitioner's and the 1st Respondent Vessel and / or her Owners ie. the 2nd Respondent; (ii) no supplies have been made by the Petitioner to the 1st Respondent Vessel at the instance of the 2nd Respondent. Hence, the Petitioner is not entitled to maintain the present case;

(f) Further on the Petitioner's own averments the said Oil Marketing allegedly supplied bunkers at the request and instance of Cross World's alleged agents, Cockett Marine. The Petitioner can not proceed against the 1st and the 2nd Respondents for alleged supplies not requested for by these Respondents. Since, no such personal liability exists, the present Jurisdiction case is not maintainable and liable to be dismissed;



5

Without prejudice to the above, even otherwise the Petitioner is not entitled to sue for the alleged supply of the said bunkers as the same were not supplied by the Petitioner but by one Oil Marketing. There is no pleading that the Petitioners have paid the said Oil Marketing. The Petitioners have therefore no entitlement to raise the alleged claim. Furthermore, the Bunker Delivery Notes (annexed at Exhibit – P1) indicate that the alleged delivery of bunkers was subject to the General terms and conditions of Oil Marketing & Trading International LLC and not these Respondents. Hence, (i) the Petitioners themselves have not paid for the bunkers and (ii) the Petitioners have themselves not supplied the said bunkers. The Petitioner has no title to the said supplies and have no locus to institute and / or maintain the Special Jurisdiction case. In the absence of proof of payment to the said Oil Marketing & Trading International LLC, the Petitioners have no right and / or entitlement to invoke the Admiralty jurisdiction of this Hon'ble Court, file the present Petition *in rem* against the Vessel in respect of the alleged supplies;

(d)   In any event no action *in rem* can lie against the Vessel for the following reasons;

a. there is no Contract between the Petitioners and these Respondents. The 1st Respondent Vessel, at the relevant time was on a Time Charter to Gross World and therefore the alleged supplies were at the request of the Time Charterers. The assertion that the request by Gross World or their Agents was authorized by the Owners of the Vessel is completely bald and unsubstantiated. In any event the same is denied;

b. Further, the reliance on Section 70 of the Indian Contract Act is completely misconceived as the said statute has no application to the alleged supplies effected in Khorfakkan at the request of a Foreign Company i.e. Cockett Marine to a Foreign Flag Vessel. Without prejudice to the foregoing, in any event the entitlement under Section 70 of the Contract Act would be only qua Cross World and / or Cockett Marine.



(c)  Without prejudice to the above, it is further submitted that no benefit has been derived by these Respondents from the alleged supplies made to the time Charterer under the Time Charter Party dated 23rd November, 2005. The said Charter Party was a Time Charter Party in the Baltime form. A copy of the said Charter Party is annexed and marked EXHIBIT R2 (A) hereto. The Charterers not only failed to pay the Charter Hire to the tune of USD 236949.67 under the Charter Party but in fact abandoned the Vessel at the Port of Umm Qasr in Iraq. As against the quantity of bunkers provided by the Owners to the Charterers at the time of delivery under the Time Charter dated 23rd November, 2005 (i.e. 120 MT of IFO and 12 MT of MDO) at the time of her repossession only a quantity of 19.50 M. of IFO and a quantity of 0 MT of MGO was on board. Hence, the 2nd Respondent has not received, any benefit of the bunkers supplied to the Charterers.

8.  It is respectfully submitted that because of that above Sp.J. C. preferred by the Petitioners which is nothing but a misuse of process of law initiated with the malafide motive of putting economic duress on these Respondents and to unjustly enrich there from, the 1st respondent vessel happened to be detained during the period 14.11.2005 to 6.12.2006. Over and above the fact that the schedule of the vessel was disrupted which has a snowballing effect leading to huge financial liabilities by way of loss of Charter Hire to the sum of USD 119,465, huge expenses had to be incurred by these Respondents under various heads including idling costs. The loss thus suffered by these Respondents till date has been computed at USD 25670.13 during the period of Arrest of the Vessel. Although the Vessel was under Arrest from 14.11.2006 to 08.12.2006, these Respondents have conservatively assessed their losses only from the date on which the Vessel completed discharge post Arrest ie. from 21.11.2006 till the date of release of the Vessel ie. 08.12.2006, for a period of 16 days. These Respondents crave leave to add to and / or augment their loss on a detailed computation thereof at a later stage. However for the purposes of this Application, the loss so assessed comprises of the following:-

(a) Bunkers of 33.90 MT consumed from 21.11.2006 till 08.12.2006 at a cost of USD 637 per MT aggregating to USD 21594.30;

(b) Fresh Water of 74 MT consumed between the period 21.11.2006 to 08.12.2006 at a cost of USD 10 per MT aggregating to USD 740; .

(c) P & I premium and H & M premium per day x 16 days at USD 172.88 per day aggregating to USD 2766.03;

(d) Lube Oils consumed at 370 litres between the period 21.11.2006 to 08.12.2006 at a cost of USD 1.54 per litre aggregating to USD 569.80, totaling to USD 25670.13.

A detailed tabulation of the said losses is summarized in an Annexure produced as **EXHIBIT R2 (B)**.

The consumption of Bunkers, Lube Oils and Fresh Water is evident from an extract of the Deck and Engine Log Books of the Vessel, which extract is annexed hereto as **EXHIBIT R2 (C)**. The Invoice raised for supply of Fresh Water and Fresh Water Receipt is annexed as **EXHIBIT R2 (D) & (E)** respectively and the confirmation statement as of 30.11.2006 of the supplier, Khorkalba Marine Services, of Fresh Water supplied to the vessel is annexed hereto as **EXHIBIT R2 (F)**. These Respondents submit that in addition to the aforesaid losses, these Respondents have suffered losses by way of proportionate Crew Wages during the period of Arrest estimated at USD 13000; Provision for 22 Crew Members on board at USD 1760; communication expenses in the sum of USD 300 as also legal costs, all of which these Respondents crave leave of this Hon'ble Court and reserve their right to claim from the Petitioners.

9.  In the circumstances aforesaid, the Applicant submits that the arrest of the Vessel is without jurisdiction, wrongful, illegal and misconceived. The Petitioner's purported

claim is untenable and in any event not maintainable *in rem* against the 1st Respondent Vessel.

10. Hence, these Respondents submit that they are also entitled for the following reliefs:

(a)  The Special Jurisdiction case No. 3 of 2006 filed by Petitioner be dismissed and / or rejected by this Hon'ble Court.

(b)  The Order of Arrest dated 14th November, 2006 passed by this Hon'ble Court be vacated.

(c)  The Registrar General of this Hon'ble Court be forthwith directed to refund to the Constituted Attorney of these Respondents the security put up for obtaining the release of the Vessel.

(d)  The Petitioner be ordered and directed to pay to these Respondents the sum of USD 25671.13 (or its Indian currency equivalent at Rs. 11,69,017.72 p at the exchange rate of 1 USD = Rs. 45.54p) as costs and damages on account of wrongful arrest.

(e)  In the alternative to (d) above, the Registrar General of this Hon'ble court be directed to retain the security put up by the Petitioner in terms of this Hon'ble Court's Order dated 14th November, 2006, as security for these Respondents' costs and damages till the conclusion of the Respondents' separate action before the appropriate forum seeking damages for wrongful arrest of the 1st Respondent Vessel.

11.  These Respondents submit that they are entitled to the aforesaid reliefs in the facts and circumstances of the case. The issues raised in this Counter affidavit are substantially issues of law, not involving any disputed facts and can be conveniently and properly adjudicated upon at the threshold. It is therefore just, necessary, convenient and in the interest of justice that the issues of jurisdiction and maintainability be determined as preliminary issues. For the reasons set out hereinbefore, these Respondents have an excellent case / defence on merits and the

9

case, the Petitioner is ex-facie untenable and devoid of any merits. The arrest of the 1st
Respondent Vessel (at the instance of the Petitioner) is not only wrongful but also grossly
negligent and / or malicious entitling these Respondents to compensatory costs. The balance of
convenience is also in favour of these Respondents for grant of relief's as prayed.

12.      For these and other grounds to be urged at the time of hearing it respectfully
prayed that this Hon'ble Court may be pleased to dismiss the above Sp. J. C. with Compensatory
costs to these Respondents as claimed above, as also vacate/recall the order of Arrest dated
14th November, 2006 passed by this Hon'ble Court and consequently direct the Registrar
General of this Hon'ble Court to forthwith refund to the Constituted Attorney of these
Respondents the security put up for obtaining the release of the Vessel.

13.      Irreparable loss and injury will be caused to these Respondents if the said prayer is
not granted.

Dated this the 18th day of January, 2007.



DEPONENT
CONSTITUTED ATTORNEY OF 2ND RESPONDENT

Identified by me;
M/s. DASI OLKAR
ADVOCATS
Commonwealth Building,
3rd Floor, 2-4 Oak Lane,
Fort Mumbai -400 453.

Solemnly affirmed and signed before me by the Deponent who is personally known to me on
this the          day of January, 2007 in my office at Mumbai.

Notary BEFORE ME

B. O. JAISWAL
DIA FORM, DECILLS.
ADVOCATE HIGH COURT &
NOTARY, GOVT. OF INDIA
21, SAI LEELA, BALLABH NAGAR,
DOMBIVLI (W), 421 202.
DIST. THANE    MAHARASHTRA

EXHIBIT - R2(A)

[stamp]

| | |
|---|---|
| **Shipbroker**<br>ADVANCED OCEAN SHIPPING<br>P O BOX 4686, DUBAI,<br>(3B, ORIENTAL HOUSE , BANK STREET,<br>909 DUBAI DUBAI, U.A.E. | THE BALTIC AND INTERNATIONAL MARITIME CONFERENCE UNIFORM TIME-CHARTER (Box Layout 1974)<br>CODE NAME: "BALTIME1939"<br>    PART I |
| | 1. Place and date Dubai, November 13, 2005 |
| 3 Owners / Place of business<br>NOVSTAR SHIPPING & MARINE SERVICES<br>CO. LLC, DUBAI, U.A.E. | 4 Charterers / Place of business<br>CROSSWORLD M.E.<br>Sharjah, U.A.E. |
| 5 Vessel's name   MV "BLUE STAR" | 6 GRT / NRT   6168/3046 |
| 7 Class<br>PRS (Polish Register of Shipping) | 8 Indicated horse power 5400 (3972 kw) |
| 9 Total tons d.w. (abt.) on Board of Trade summer freeboard<br>7923 | 10 Time Reg. tonnage (own by)<br>10796/10897 CBM |
| 11 Permanent bunkers (abt.)<br>IFO –180 – 105 mts, MGO – 30 mt | |
| 12 Speed capability in knots (abt) on a consumption in tons/of<br>10 knts  on  12 mts IFO-180 + 2,5 mts MDO<br>See CL 32 also | |
| 13 Present position<br>trading | |
| 14 Period of hire (CL8)  443+3 months  +/- 15 days<br>Mutual OPT (either party may exercise opt. to<br>cancel c/p giving 30/15 days notice to either party) | 15 Port of delivery (CL1)   APS 1 GSP PG or U.A.E.<br>at same time |
| | 16 Time of delivery(CL1)   23-30 OF NOV 2005 |
| 17 (a) Trade limits (CL 2)  PG, India - bay of Bengal , Red  and  Africa east coast up to Somalia<br>Excluding War or Warlike Zones | |
| 18. Cargo exclusions specially (excluded, (43)  No live  nor injurious, inflammable or dangerous goods to<br>stock<br>be shipped . see CL 40 also | |
| 19 ( 8 ) Bunkers on redelivery (see also items 20 and 26) 15,(18.5)<br>The same as on delivery , but in  no case<br>sufficient to reach Fujairah. | See CL 37 also |
| 20 Cash for (CL 8)<br>USD 4250 PDPR 1OT | 26 Hire, Sept.of (name currency mode and place of<br>payment; also benefit(ally and bank accounting(CL)<br>15 days in advance in US dollars to Owners Bank<br>Account, payable within 3 bank working days. |
| 21 Place of range of redelivery (CL 7)<br>DOP 1 GSP PG or W.C. India including | 22 War risky (see also 2nd Section (C) agree) (Cl 21)<br>Amounts agreed upon as in () when required |
| 23 Cancelling date (cl. 12 ) 30'" OF NOV , 2005 | 24 (Port of d.d.bitution (party order, if not so if place other than<br>London agreed ) (CL 23 ) |
| 25 Brokerage commission and to whom payable (CL 28)<br>3,75 TTL (Add'cts Commission-2,5% + 1,25%<br>AOS as Broker) | 26 New: list of additional clauses covering special provisions,<br>if agreed<br>Clauses 1-28 of Part II and additional<br>Clauses 16 – 59 will to be fully incorporated in this<br>Charter Party |

It is mutually agreed  at this Contract shall  be performed subject to the conditions contained in this Charter which shall include Part I as well as Part II. In the event of a conflict of conditions the provisions of Part I shall prevail over those of Part II to the extent of such conflict

| Signature (Owners) | Signature ( Charterers ) |
|---|---|
| | |

Printed and ublik by F O Knudtsen I O. 55 Indoveboat Copen  open
by authority of The Baltic and  International Maritime Conference Copenhagen

TRUE - ONE

[signature]

PART II

"BALTIME 1939" UNIFORM TIME – CHARTER (Box 1.4 ed. 1974)

It is agreed between the party mentioned in Box 3 as the Owners of the Vessel named in Box 5 of the following specified tonnage indicated in Box 6, classed as stated in Box 7 and of indicated horse power as stated in Box 8, carrying about the number of tons deadweight indicated in Box 9 on Board of Trade summer freeboard inclusive of bunkers, stores, provisions and boiler water, having, as per builder's plan a cubic feet, grain/bale capacity as stated in Box 10, exclusive of permanent bunkers which contain about the number of tons stated in Box 11, and fully loaded capable of steaming about the number of knots indicated in Box 12 in good weather and smooth water on a consumption of about the number of tons best welsh coal/IFO+MDO stated in Box 13, now in position as stated in Box 13 and the party mentioned as Charterers in Box 4, as follows:

**1. Period/Port of Delivery/Time of Delivery**
The Owner let, and the Charterers hire the Vessel for a period of the number of calendar months indicated in Box 14, commencing from the time (not earlier than/not later than) the Vessel is delivered and placed at the disposal of the Charterers between 9 A.M. and 6 P.M., or between 9 A.M. and 2 P.M. on Saturday, at the place port stated in Box 15, in such available berth where she can safely lie always afloat, as the Charterers may direct, she being in every way fitted for ordinary cargo service.
The Vessel to be delivered at the time indicated in Box 16

**2. Trade**
The Vessel to be employed in lawful trades for the carriage of lawful merchandise only between good and safe ports or places where she can safely lie always afloat within the limits stated in Box 17
No live stock nor injurious, inflammable or dangerous goods (such as acids, explosives calcium carbide, ferro silicon, naphtha, motor spirit, tar, or any of their products) to be shipped.

**3. Owners to Provide**
The Owners to provide and pay for all provisions and wages, for insurance of the Vessel, for all deck and engine room stores and maintain her in a thoroughly efficient state in hull and machinery during service.
The Owners to provide one winchman per hatch. If further winchmen are required, or if the stevedores refuse or are not permitted to work with the Crew, the Charterers to provide and pay qualified shore winchmen

**4. Charterers to provide**
The Charterers to provide and pay for all coals, including galley coal, oil fuel, water for boilers, port charges, pilotages, towages, consular charges, dock, canal, dues and other charges whatsoever including any foreign general municipality or state taxes, also all dock, harbour and canage dues at the ports of delivery and re-delivery (unless incurred through cargo carried before delivery or after re-delivery), agencies, commissions, also to arrange and pay for loading, trimming, stowing (including dunnage and shifting boards excepting any already on board), unloading, weighing, tallying and delivery of cargoes, surveys of hatches, meals supplied to officers and men in their service and all other charges and expenses whatsoever including detention and expenses through quarantine (including cost of fumigation and disinfection).
All ropes, slings, and special runners as usually used for loading and discharging and any special gear, including special ropes, hawsers and chains required by the custom of the port for mooring to be for Charterers's account. The Vessel to be fitted with winches, derricks, winches and ordinary runners capable of handling lifts up to 2 tons

**5. Bunkers**
The Charterers at the port of delivery and the Owners at port of re-delivery to take over and pay for all coal and/or IFO+MDO remaining in the Vessels bunkers at current price at the respective ports. The Vessel to be re-delivered with not less than the number of tons and not exceeding the number of tons coal and/or coals of IFO+MDO in the Vessels bunkers stated in Box 13. see c. 22

**6. Hire**
The Charterers to pay as hire the rate stated in Box 19 per 18 days, commencing in accordance with Clause 1, until her re-delivery to the Owners Payment
Payment of hire to be made in cash, in the currency stated in Box 20, without discount, every 15 days, in advance, and in manner prescribed in Box 20.
In default of payment the Owners to have the right of withdrawing the Vessel from the service of the Charterers, without noting any protest and without interference by any court or any other formality whatsoever and without prejudice to any claim, the Owners may otherwise have on the Charterers under the Charter.

**7. Re-delivery**
The vessel to be re-delivered on the expiration of the Charter in the same good order as when delivered to the Charterers (fair wear and tear excepted) at an ice-free port in the Charterers' options at the place or within the range stated in Box 21, between 9 A.M. and 6 P.M., and 9 A.M. and 2 P.M. on Saturday, but the day of re-delivery shall not be a Sunday or legal Holiday.
Notice
The Charterers to give the Owners not less than ten days' notice at which port and on about which day the Vessel will be re-delivered.
Should the Vessel be ordered on a voyage by which the Charter period will be exceeded the Charterers to have the use of the Vessel to enable them to complete the voyage, provided it could be reasonably calculated that voyage would allow redelivery about the time fixed for the termination of the Charter, but for any time exceeding the termination date the Charterers to pay the market rate if higher than the rate stipulated herein.

**8. Cargo Space**
The whole reach and burden of the Vessel, including deck-capacity available to the Charterers' disposal, reserving proper and sufficient space for the Vessels Master, Officers, Crew, tackle, apparel, furniture, provisions and stores

**"BALTIME 1939" UNIFORM TIME – CHARTER (Box Layout 1974)**

PART II

| | |
|---|---|
| 9. ... | 137 |
| ...with the best dispatch and to render customary... assistance with the Vessels Crew. The Master to be under the orders of the Charterers as regards employment, agency or other arrangements. The Charterers to indemnify the Owners against all consequences or liabilities arising from the Master, Officers or Agents signing Bills of Lading or other documents or otherwise complying with such orders, as well as from any irregularity in the Vessel's papers or for overcarrying goods. The Owners not to be responsible for shortage, mixture, marks, nor for number of pieces or packages nor for damage to or claims on cargo caused by bad stowage or otherwise. If the Charterers have reason to be dissatisfied with the conduct of the Master, Officers, or Engineers, the Owners, on receiving particulars of the complaint, promptly to investigate the matter, and if necessary and practicable to make a change in the appointment. | 138 139 140 141 142 143 144 145 146 147 148 149 150 151 152 153 154 155 156 |
| 10. Directions and Logs<br>The Charterers to furnish the Master with all instructions and sailing directions and the Master and Engineer to keep full and correct logs accessible to the Charterers or their Agents. | 157 158 159 160 161 |
| 11. Suspension of Hire, etc.<br>(a) In the event of drydocking or other necessary measures to maintain the efficiency of the Vessel, deficiency of men or Owners' Stores, breakdown of machinery, damage to hull or other accident, either hindering or preventing the working of the Vessel and continuing for more than twenty-four consecutive hours, no hire to be paid in respect of any time lost thereby during the period in which the Vessel is unable to perform the service immediately required. Any hire paid in advance to be adjusted accordingly.<br>(b) In the event of the Vessel being driven into port or to anchorage through stress of weather, trading to shallow harbours or to rivers or ports with bars or suffering an accident to her cargo, any detention of the Vessel and/or expenses resulting from such detention to be for the Charterers' account even if such detention and/or expenses, or the cause by reason of which either is incurred, be due to, or be contributed to by the negligence of the Owners' servants. | 162 163 164 165 166 167 168 169 170 171 172 173 174 175 176 177 178 179 180 181 182 183 184 |
| 12. Cleaning Boilers<br>Cleaning of boilers whenever possible to be done during service, but if impossible the Charterers to give the Owners necessary time for cleaning. Should the Vessel be detained beyond 48 hours hire to cease until again ready. | 185 186 187 188 189 190 |
| 13. Responsibility and Exemption<br>The Owners only to be responsible for delay in delivery of the Vessel or for delay during the currency of the Charter and for loss or damage to goods onboard, if such delay or loss has been caused by want of due diligence on the part of the Owners or their Manager in making the Vessel seaworthy and fitted for the voyage or any other personal act or omission or default of the Owners or their Manager. The Owners not to be responsible in any other case nor for damage or delay whatsoever and howsoever caused even if caused by the neglect or default of their | 191 192 193 194 195 196 197 198 199 200 201 202 203 204 |
| servants. The Owners not to be liable for loss or damage arising or resulting from strikes, lockouts or stoppage or restraint of labour (including the Master, Officers or Crew) whether partial or general.<br>The Charterers to be responsible for loss or damage caused to the Vessel or to the Owners by goods being loaded contrary to the terms of the Charter or by improper or careless bunkering or loading, stowing or discharge of goods or any cargo whatsoever or by any act or default of the Charterers or their servants. | |
| 14. Advances<br>The Charterers or their Agents to advance to the Master, if required, necessary funds for ordinary disbursements for the Vessel's account at any port charging only interest at 6 per cent p.a., such advances to be deducted from hire. | |
| 15. Excluded Ports<br>The Vessel not to be ordered to nor bound to enter (a) any place where fever or epidemics are prevalent or to which the Master, Officers and Crew by law are not bound to follow the Vessel nor<br>(b) any ice-bound place or any place where lights, lightships, marks and buoys are or are likely to be withdrawn by reason of ice on the Vessel's arrival or where there is risk that ordinarily the Vessel will not be able on account of ice to reach the place or to get out after having completed loading or discharging. The Vessel not to be obliged to force ice nor to follow ice-breakers when inward bound. If on account of ice the Master considers it dangerous to remain at the loading or discharging place for fear of the Vessel being frozen in and/or damaged he has liberty to sail to a convenient open place and await the Charterers' fresh instructions. Unforeseen detention through any of above causes to be for the Charterers' account. | |
| 16. Loss of Vessel<br>Should the Vessel be lost or missing, hire to cease from the date when she was lost. If the date of loss cannot be ascertained half hire to be paid from the date the Vessel was last reported until the calculated date of arrival at the destination. Any hire paid in advance to be adjusted accordingly. | |
| 17. Overtime<br>The Vessel to work day and night if required. The Charterers to refund the Owners their outlays for all overtime paid to Officers and Crew according to the hours and rates stated in the Vessel's articles. | |
| 18. Lien<br>The Owners to have a lien upon all cargoes and sub-freights belonging to the Time-Charterers and any Bill of Lading freight for all claims under this Charter, and the Charterers to have a lien on the Vessel for all monies paid in advance and not earned. | |
| 19. Salvage<br>All salvage and assistance to other vessels to be for the Owners' and the Charterers' equal benefit after deducting the Master's and Crew's proportion and all legal and other expenses including hire paid under the Charter for time lost in the salvage, also repairs of damage and coal or oil consumed. The Charterers to be bound by | |

PART II

## "BALTIME 1939" UNIFORM TIME - CHARTER (Box Layout 1974)

All measures taken by the Owners in order to
secure payment of salvage, and to fix its amount.

### 20. Sublet

This Charterers to have the option of subletting
the Vessel, giving due notice to the Owners, but
the original Charterers prior to to remain responsible
to the Owners for due performance of the
Charter.

### 21. War

(A) The Vessel unless the consent of the Owners
be first obtained not to be ordered nor continue
in any place or on any voyage nor be used on
any service which will bring her within a zone
which is dangerous as the result of any actual
or threatened act of war, or hostilities, warlike
operations, acts of piracy or of hostility or
malicious damage against this or any other vessel
or its cargo by any person, body or State
whatsoever, revolution, civil war, civil commotion or
the operations of international law, nor be
exposed in obeying to any rules or penalties whatsoever
consequent upon the imposition of
Sanctions, nor carry any goods that may in any way
expose her to any risks of seizure, capture,
penalties or any interference of any kind
whatsoever by the belligerent or fighting power
or parties or by any Government or Ruler

(B) Should the Vessel approach or be brought in
or risk within such zone or be exposed in any
way to the said risks, (1) the Owners to be
entitled from time to time to insure their interests
in the Vessel and / or the against any of the risks
likely to be involved thereby on such terms as
they shall think fit, the Charterers to make a
refund to the Owners of the premium on demand;
and (2) notwithstanding the terms of Clause 11
hire to be paid for all time lost including any time
lost owing to loss of or injury to the Master,
Officers, or Crew or to the action of the Crew in
refusing to proceed to such zone or to be
exposed in such risks

(C) In the event of the wages of the Master,
Officers and Crew or the cost of provisions and /
or stores for deck and / or engine room and / or
insurance premium being increased by reason
of or during the existence of any of the matters
mentioned in section (A) the amount of any
increase to be added to the hire and paid by the
Charterers on production of the Owners' account
therefor such account being rendered monthly.

(D) The Vessel to have liberty to comply with
any orders or directions as to departure, arrival,
routes, ports of call, stoppages, destination,
delivery or any other wise whatsoever given by
the Government of the nation under whose flag
the Vessel sails or any other Government or any
person (or body) acting or purporting to act with
the authority of such Government or by any committee

| 273 |
| 274 |
| 275 |
| 276 |
| 277 |
| 278 |
| 279 |
| 280 |
| 281 |
| 282 |
| 283 |
| 284 |
| 285 |
| 286 |
| 287 |
| 288 |
| 289 |
| 290 |
| 291 |
| 292 |
| 293 |
| 294 |
| 295 |
| 296 |
| 297 |
| 298 |
| 299 |
| 300 |
| 301 |
| 302 |
| 303 |
| 304 |
| 305 |
| 306 |
| 307 |
| 308 |
| 309 |
| 310 |
| 311 |
| 312 |
| 313 |
| 314 |
| 315 |
| 316 |
| 317 |
| 318 |
| 319 |
| 320 |
| 321 |
| 322 |
| 323 |
| 324 |
| 325 |
| 326 |
| 327 |
| 328 |
| 329 |
| 330 |

or person having under the terms of the
war risk insurance on the Vessel the right to
give any such orders or directions

(E) In the event of the nation under whose flag
the Vessel sails becoming involved in war,
hostilities, warlike operations, revolution, or civil
commotion, both the Owners and the Charterers
may cancel the Charter and, unless otherwise
agreed, the Vessel to be re-delivered to the
Owners at the place of destination or, if prevented
through the provisions of section (A), from reaching
or entering it, then at a near open and safe
port at the Owners' option, after discharge of any
cargo on board

(F) If in compliance with the provisions of this
clause anything is done or is not done such act
to be deemed a deviation

Section (C) is optional and should be considered
deleted unless agreed according to Box 22

### 22. Cancelling

Should the Vessel not be delivered by the date
indicated in Box 23, the Charterers to have the
option of cancelling

If the Vessel cannot be delivered by the cancelling
date, the Charterers if required, to declare
within 48 hours after receiving notice thereof
whether they cancel or will take delivery of the
Vessel

### 23. Arbitration

Any dispute arising under the Charter to be
referred to arbitration in London (or such other
place as may be agreed according to Box 24)
one Arbitrator to be nominated by the Owners
and the other by the Charterers, and in case the
Arbitrators shall not agree then to the decision
of an Umpire to be appointed by them, the award
of the Arbitrators or the Umpire to be final and
binding upon both parties.

### 24. General Average

General Average to be settled according to York
Antwerp Rules, 1974. Hire not to contribute to
General Average

### 25. Commission

The Owners to pay a commission at the rate
stated in Box 26 to the party mentioned in Box
26 on any hire paid under the Charter, but in no
case less than is necessary to cover the
expenses of the Brokers and a reasonable fee
for their work. If the full hire is not paid owing to
breach of Charter by either of the parties the
party liable to pay the indemnity to the Brokers
against loss of commission.
Should the parties agree to cancel the Charter,
the Owners to indemnify the Brokers against any
loss of commission but in such case the
commission not to exceed the brokerage on one
year's hire.



## RIDER CLAUSES
### TO CHARTER PARTY M/V "BLUE STAR" DATED NOVEMBER 23, 2005 IN DUBAI

**CL. 26. Speed and Bunker Consumption**

If during any passage from port to port, Vessel's speed is reduced - unless caused by bad weather Beaufort Scale 4, or by required prudent action of the Master based on concern for the safety of the ship cargo or other justifiable circumstances, or in harbour, straits, or narrow water or if instructed by Charter or if bunker consumption is greater than that described, the Charterer may submit a claim to the Owner the time so lost and the costs of extra bunkers so consumed. The speed claim is to be supported by recognized weather routing service. The Owners to have the benefit of any bunker saving due to perform speed being slower than specified speed, and such savings shall off-set the speed claim. For purpose calculating bunker savings, the bunker price used shall be the last price paid. Such claim (should be there any reasons) submit to the Owners right now after completion each single voyage.

Charterers have the option to supply weather routing service to the Master and in such case Master to com with reporting procedure at all times. However, the final decision as to the route selection and navigation the vessel will be the Master's. Evidence of weather conditions will be taken from the vessel's deck logs independent weather bureau reports. However, in case of discrepancy ocean routing to be final and bir or both.

**CL. 27. Cargo Gear Breakdown**

If the cargo gear breaks down by reason of disablement or insufficient power not caused by default of the labourers, and if delay is occasioned thereby, the hire shall be reduced on a pro rata basis during the period such disablement or insufficiency in relation to the number of cargo gears units available. In case if breakdown isn't repaired within 24 hrs Owners shall pay the cost of additional labor required because of breakdown, and for hiring of shore appliances, provided that Master or responsible officer of the Vessel in writing approved the same. The total cost per day payable by Owners shall not exceed Vessel's daily If the Owners hire shore appliances sufficient to replace the Vessel's disabled cargo gear, then Vessel remain fully on hire. Gangs will standby and charges will be for Owners acct or gangs will be cancelled and will come on-hire only on resumption of cargo operations

**CL. 28. Owners' Agents**

While on hire and during the period of this Charter, the Owners at no extra cost to themselves can Chartered agents at all ports of call for normal husbandry matters. For any extraordinary requirements as crew repatriation, dry-docking, survey work and the like, Owner to be responsible for reaching arrangement to reimburse agents for their time and costs or Owner shall appoint their own agents at expense

Owners to directly liaise with the agents and place their in funds for all their requirements.

**CL. 29. Fumigation**

Expenses in connection with fumigation or quarantine ordered because of cargoes carried or port ve while the vessel is employed under this charter to be for Charterers' account. Expenses in connection with other fumigation or quarantine to be for Owners' account.

**CL. 30. Communications and Gratuities**

Charterers are to be charged USD 700.00 for communications per 30 days or pro rata including Master representation and the same to be included with charter hire payments.

**CL.31. Services**

In addition to Master's duties to render all customary assistance ref. clause 8 in the Charter Party, the vessel work.

day and night, if required by Charterers and all cranes to be at Charterers' disposal during loading, discharging



RIDER CLAUSES
TO CHARTER PARTY M/V "BLUE STAR" DATED NOVEMBER 23, 2005 IN DC

Customary assistance with the vessel's crew impliedly means all normal functions of the crew same, trading

for Owners' own account and shall include, but not limited to:

(a) Raising and lowering of cranes and rigging cranes and/or gangways in preparation for and discharging.

(b) Opening and closing of hatches in connection with loading and discharging, local regulatic permitting

(c) Closing and opening of hatches in the event of weather which may adversely condition of cargo carried on board during loading and discharging, local reg permitting

(d) Customary supervision / Cargo Watch keeping of loading and discharging, Master to responsible for the stowage of the vessel insofar as this concerns the trim and/or stab the vessel.

(e) Maintaining sufficient steam/electric power and all cranes in good order whilst loadi discharging, including regular maintenance of cranes

(f) Shifting vessel during loading and discharging and shifting berth

(g) Docking and undocking.

(h) Bunker

If local rules, regulations or authorities do not allow the crew to assist, shore labours to be emp by

Charterers at their expense. Should any loss occur to the vessel during Cargo operations the vesse it can in no hire

## CL. 52. Arrest

If the Vessel is arrested during the period of the charter by any person having or purporting to have a against the Owner of the Vessel or an interest in the Vessel and if delay is occasioned thereby, hire t this Charter Party shall not be payable in respect of any period while the Vessel remains under arres delayed. All charges caused by arrest to be fully paid by Owner. This Clause is inoperable should the a be caused by any act or omission of Charterers or their agents.
Owners must place the vessel in same or equivalent position as when the off Hire commenced.

## CL. 53. Deductions from Hire

Charterers shall have the right to deduct from hire payments the pro rata Portion of the hire correspondi any periods of off-hire actually experienced, or planned and notified by Owners (as for dry-docking), as as any amount for Owners' account invoiced to or disbursed by Charterers, provided such deduction supported by vouchers or other adequate documentation, including telex or facsimile statements from ag Charterers have the further right to deduct from their final payment of hire the estimated amou disbursements for Owners' account outstanding for which vouchers have not yet reached Charterer. Vouc supporting all deductions from charter hire are to be submitted to Owners within one months follo



RIDER CLAUSES
TO CHARTER PARTY M/V "BLUE STAR" DATED NOVEMBER 23, 2005 IN DUBAI

redelivery of the vessel for final confirmation, which shall require Owners approval.

### CL. 34. Watchmen
Expenses for compulsory watchmen are to be for the Charterer's account.

### CL. 35. Hire
In the event of payments as per clause 6 not being made on the due date (within 3 banking days after invoice submitted to Charterers), the owners shall notify the Charterers in writing (fax or telex), whereupon Charterers shall make payment of the entire amount as demanded by owners during 3 (three) days of receipt of notification from Owners, failing which Owners shall have the right to withdraw the vessel from service of the Charterers without prejudice to any claim Owners may have otherwise on the Charterers under charter party.

### CL. 36 . P & I Club :
Owner guarantees that the vessel shall be fully covered by P & I Club, Charterers have the benefit of Owners cover or entry granted by the P & I Club in far as the rules permit.

### CL. 37. Bunkers
The vessel to be delivered with quantity according to the Master's Delivery Notice, and the vessel to be redelivered
with about the same quantities, but in any case sufficient to reach Fujairah port. The Charterers on delivery Owners on redelivery to take over and pay for such bunkers at follow prices: USD 280/mt for IFO –180 and USD510/mt for MDO.

### *Bunker specifications:*
Bunker delivered onboard should have a Certificate of Quality and comply with all specification accordance with MDO – DMA/DHX, IFO 180 – RME25/RMF25, Otherwise products must be homoge and not include automotive lubricating oil, or any other waste chemicals/non fuel components which will impair the efficiency of the purification or the engine system.

### CL. 38 Joint Survey
Charterers may request that a joint survey be held at the port of delivery and redelivery in Owner's Charterer's time respectively for the purpose of ascertaining the quantity of bunkers remaining on be Expenses of such survey shall be shared equally between Owners and Charterers.
Charterers option to carry out condition survey.

### CL. 39. Bill's of Lading
Charterers and their agents have the right to sign Bills of Lading in accordance with Mate's receipts on behalf of the Master. Charterers will be responsible for insuring that all Bills of Lading issued by them, their agents or by any sub-charterers or their agents under this charter party shall incorporate the Hague or Hague-Visby Rules or similar legislation. Neither the Charterers nor their agents shall permit the issuance of any Bill of Lading or waybills, whether or not signed on their behalf or on behalf of Owners, voluntarily incorporating the Hamburg Rules or any legislation under which the Hamburg Rules are compulsorily applicable in respect of any contract of carriage under this charter or any sub-charter
If Owners sustain a liability arising from the application of the Hamburg Rules in circumstances where the rules were not compulsorily applicable and where the Owners would not otherwise have sustained a liability then the Charterers shall indemnify the Owners for all loss and damage sustained thereby.

### CL. 40. Prohibition of Lien
Charterers will not suffer, nor permit to be continued beyond 3 business days, any lien or encumbrance

3



RIDER CLAUSES
TO CHARTER PARTY M/V "BLUE STAR" DATED NOVEMBER 23, 2005 IN DUBAI

inserted by them or their agents, which shall have priority over the title and interest of the Owners in the vessel

## CL. 41. U.S. Anti Drug Abuse Act 1986

A. In pursuance of the provisions of the U.S. Anti Drug Abuse Act 1986, or any re-enactment thereof, the Charterers warrant to exercise the highest degree of care and diligence in preventing unmanifested narcotic drugs and marijuana to be loaded or concealed on board the Vessel

If despite the exercise of the highest degree of care and diligence, narcotics, drugs or marijuana are concealed onboard the vessel, the Charterers shall be liable and shall hold the Owners, the Master and the crew of the vessel harmless and shall keep them indemnified against all claims whatsoever which may arise and be made against them individually or jointly for the consequences thereof. Furthermore, all time lost and all expenses incurred, including fines, shall be for the Charterers' account and the Vessel shall remain on hire.

Should the vessel or any crew member, be arrested, the Charterers shall at their expense take all reasonable steps to secure that within a reasonable time the Vessel and crew members are released and shall at their expense put up bail to secure release of the Vessel and any crew members arrested.

The Owners shall remain responsible for all time lost and all expenses incurred, including fines, in the event that unmanifested narcotic drugs and marijuana are found in the possession or effects of the Vessel personnel.

B. In pursuance of the provisions of sub-clause (A) above, the Owners and the Charterers warrant that they shall both become signatories to the sea Carrier Initiative agreement on signing this Charter Party or delivery of the Vessel under this charter, whichever is earlier, and will so remain during the currency of this Charter.

## CL. 42. Others
The following clauses are hereby deemed to be incorporated in this Charter Party:
- Both-to-Blame Collision Clause
- New Jason Clause
- General Paramount Clause

## CL. 43. STEVEDORES DAMAGES
Any damage to the vessel or loss to its equipment caused by stevedores during the currency of this Charter Party shall

be reported to the Charterers or their agents, in writing, within 24 hours of the occurrence or as soon as possible thereafter but later when the loss or damage could have been discovered by the exercise of due diligence. The Master shall immediately endeavour to obtain written acknowledgement of the damage and liability from the stevedores and keep the Charterers properly informed of the results

The Charterers shall pay for properly reported damages which to be in conformity with an independent official survey report. Master/Owners must appoint joint survey to ascertain nature/extent/cause of such damage. Damages which are to be repaired by Charterers and do not refer to fair, wear and tear or affect the vessel' class or seaworthiness are to remain for Charterers' account when the vessel is to dock for Owners' own account so that Charterers pay only for the actual costs as stated above but not for the time so used.

## CL. 44. Arbitration and Applicable Law
The Charter Party shall be governed and construed in accordance with English Law and any dispute arising



## RIDER CLAUSES
### TO CHARTER PARTY M/V "BLUE STAR" DATED NOVEMBER 23, 2005 IN DUB?

out of this Charter Party shal' be referred to arbitration in London in accordance with the Arbitration 1950 and 1979 or any statutory modification or re-enactment thereof for the time being in force. Unless parties agree upon a sole arbitrator, one arbitrator shall be appointed by each party and the arbitrator appointed shall appoint a third arbitrator, and the decision of the three-man tribunal thus constituted or two of them, shall be final. On the receipt by one party of the nomination in writing of the other party arbitrator, this party shall appoint its arbitrator within fourteen days, failing which the decision of the a arbitrator appointed shall be final.

For claimes where the total amount claimed by either party does not exceed the amount of US$ 30,0 the arbitration shall be conducted in accordance with the Small Claims Procedure of the London Mari Arbitrators Association.

### CL. 45. Stowaways Clause for Time Charters

The Charterers warrant to exercise due care and diligence in preventing stowaways in gaining access to Vessel by means of secreting away in the goods and/or containers shipped by the Charterers.

If, despite the exercise of due care and diligence by the Charterers, stowaways have gained access to Vessel by means of secreting away in the goods and/or containers shipped by the Charterers, this amount to breach of charter for the consequences of which the Charterers shall be liable and shall hold Owners harmless and shall keep them indemnified against all claims whatsoever which may arise an made against them. Furthermore, all time lost and all expenses whatsoever and howsoever incur including fines, shall remain on hire.

Should the Vessel be arrested as a result of the Charterers' breach of charter as described above, Charterers shall take all reasonable steps to secure that, within a reasonable time, the Vessel is released at their expense put up bail to secure release of the Vessel.

If, despite the exercise of due care and diligence by the Owner, stowaways have gained access to the Ve by means other than secreting away in the goods and/or containers shipped by the Charterers, all time and all expenses whatsoever and howsoever incurred, including fines, shall be for the Owners' account & Vessel shall be off-hire.

Should the Vessel be arrested as a result of stowaways having gained access to the Vessel by means of than secreting away in the goods and/or containers shipped by the Charterers, the Owners shall take reasonable steps to secure that, within a reasonable time, the Vessel is released and at their expense put bail to secure release of the Vessel.

### CL. 46. CARGO EXCLUSIONS

(a) cargoes classed 1,2,4,5 and others in accordance with requirements of the vessel's Exemption Certificate.

(b) Notwithstanding the provisions of clause 46 (a) are always excluded from shipment:
Radioactive products or waste, nuclear fuel, explosives, arms, ammunitions, blasting caps, black powc calcium carbide, ammonium nitrate, motorblocks, oily pieces, oily scrap, turnings, creosoted goods, naph tar or any of its products, pitch in bulk, asphalt in bulk, cement and cement clinker in bulk, directly redu iron ore/iron ore pellets of briquettes, caolin/clay in bulk, ferro silicon in bulk, livestock of any descript copper-zinc ore/centrates in bulk and all loads.

If the Charterss will intend carrying sulphur in bulk, then both lime coating of the vessel's holds i fresh water treatment after discharging is essential and are for the Charterers account. In case sulphur cargo other than lump grade, the Charterers to be responsible for consequences that may arise connection with.

5

RIDER CLAUSES

TO CHARTER PARTY M/V "BLUE STAR" DATED NOVEMBER 23, 2005 IN DUBAI

CL. 47. Intermediate hold cleaning

The vessel crew shall render customary assistance in cleaning cargo holds in preparation for the next cargo if required by Charterers' on the Charterers' time and risk and if not prevented by shore regulations. Such cleaning to be performed provided this can be safely done, weather permitting. The Charterer's shall pay the Owner US$ 600 "lumpsum per voyage including removing / disposal of dunnage, if any. In any case Owners are not responsible for passing hold survey for loading of next cargo during the entire period. The work to be done in the same efficient manner to survey standards as if the vessel was trading for the Owner's account but without responsibility and liability on part of the Owners regarding the acceptance of the vessel at the loading port if the vessel is rejected due residue of the previous cargo / as carried under this charter party

CL. 48. Hold condition on redelivery :

Charterers to have the option of redelivering the vessel against paying Owners lumpsum US$ 1,500 in lieu of hold cleaning including removal / disposal of dunnage

CL. 49. Tax

All taxes on cargo and on voyage freights to be for Charterers' account, except those levied by flag of the vessel

CL. 50. Tallymen

Tallymen both at loading and discharging ports as and when required to be provided by Charterers at their expense.

CL. 51.

Owners confirm vessel has not traded to Israel, Cuba, North Korea and Vessels is not black listed by South African port authority or government

Owners guarantee that vessel is not black listed by any of vessel's calling ports and countries under the Charter.

CL. 52.

Charterers have the option to load intended cargo on deck / hatch cover at Charterers' time, expense and risk in accordance with vessel's deck / hatch cover strength and stability and also bills of lading to be clause "loaded on-deck in Charterers / Shipper's / Receiver's Risk"

CL. 53. Good weather condition

Within the context of this Charter Party, good weather conditions are understood to mean winds maximum Beaufort force 4. Evaluation of weather conditions will be taken from the vessel's deck logs and independent weather bureau reports

CL. 54. Electrical Light

The vessel to supply as and when required sufficient electric lights and lamps at all hatches and in all hold for night-work.

CL. 55. New Jason Clause

In the event of accident, danger, damage or disaster before or after commencement of the voyage resulting from any cause whatsoever, whether due to negligence or not, for which, or for the consequence of which the Shippers, Consignees or Owners of the goods shall contribute with the Carrier in general average to the payment of any sacrifices, losses or expenses of a general average nature that may be made or incurred and

0

RIDER CLAUSES
TO CHARTER PARTY M/V "BLUE STAR" DATED NOVEMBER 23, 2005 IN DUBAI

shall pay salvage and special charges incurred in respect of the goods.

If a salving ship is owned or operated by the Carrier, salvage shall be paid for as fully as if the said salving ship or ships belonged to strangers. Such deposit as the Carrier or his agents may deem sufficient to cover the estimated contribution of the goods and any salvage and special charges thereon shall, if required, made by the goods, shippers, Consignees or Owners of the goods to the Carrier before delivery.

## CL. 56. Both-To-Blame Collision Clause

If the liability for any collision in which the vessel is involved while performing this Charter Party falls to determined in accordance with laws of the United States of America, the following clause shall apply.

If the Vessel comes into collision with another ship as a result of the negligence of the other ship and any neglect or default of the Master, Mariner, Pilot or the servants of the Carrier in the navigation or the management of the Vessel, the Owners of the cargo carried hereunder will indemnify the Carrier against all loss or liability to the other or non carrying ship or her Owners in so far as such loss or liability represent loss of, or damage to, or any claim whatsoever of the Owners of said cargo, paid or payable by the other non-carrying ship or her Owners to the Owners of said cargo and set off, recouped or recovered by the other or non-carrying Vessel or her Owners as part of their claim against the Carrying Vessel. The foregoing provisions shall also apply where the Owners, operators or those in charge of any ship or ships or object other than, or in addition to the colliding ships or objects are at fault in respect of collision or contact. A the Charterers shall cause all Bills of Lading issued under this Charter Party to contain the same clause.

## CL. 57. General Paramount Clause

The Hague Rules contained in the International Convention for the Unification of certain rules relating Bills of Lading, dated Brussels the 25th August 1924 as enacted in the country of shipment shall apply to the contract. When no such enactment is in force in the country of shipment, the corresponding legislation of the country of destination shall apply, but in respect of shipments to which no such enactments are compulsorily applicable, the terms of the said Convention shall apply.

## CL. 58. Trades Where Hague-Visby Rules Apply

In trades where the International Brussels Convention 1924 as amended by the Protocol signed at Brussels February 23rd, 1968 (the Hague-Visby Rules) apply compulsorily, the provisions of the relevant legislation shall be considered incorporated in this Bill of Lading. The Carrier takes all reservations possible under such applicable legislation, relating to the period before loading and after discharging and while the goods are in the charge of another Carrier, and on deck cargo and live animals.

## CL. 60 Description of the vessel

| | |
|---|---|
| Ship's name: | Blue Star |
| Flag: | ST. KITTS & NEVIS |
| Year of Built / Where: | 1977 /VEB SCHIFFSWERFT NEPTUN-ROSTOK, GERMANY |
| Type of Vessel | GENERAL CARGO |
| D.W.T. (Full Summer Deadweight): | 7923 MT |
| L.O.A. (Length Over All): | 121.83 M |
| BEAM (Extreme): | 17.60 M |
| Moulded Depth: | 9.50 |
| Full Summer Draft: | 7.71 M |

7



RIDER CLAUSES
TO CHARTER PARTY M/V "BLUE STAR" DATED NOVEMBER 23, 2005 IN DUBAI

GRT /NRT:                         6168/3846
P&I :                             NAVIGATORS INSURANCE COMPANY, LONDON
H+M :                             "ROSNO"
DERRICK'S SWL :                   # 1 - 12 MT, ## 2,3,4 - 13 MT
HOLDS/HATCHES:                    2/2
HOLDS CAPACITY GRAIN/BAIL:        16706/10697 CBM
HATCHES :                         #1 - 26,6 M x 13 M, #2 - 33,5 x 13 M
MAIN ENGINE:                      MAN KGZ 57/80A
NEXT SS                           2009
LAST DD                           June 2005
Classification Society            PNS
IMO number                        7705770

## SPEED and CONSUMPTION:

1. AT SEA:

LADEN      R'M 130 - ABT  8.5 KNOTS ON ABT 10,5 MTS IFO-180  PLUS 2,5 TNS MDO
LADEN      R'M 175 - ABT 10,8 KNOTS ON ABT 12,5 MTS IFO-180  PLUS 2,5 TNS MDO

IN BALLAST RPM 130 - ABT  9,9 KNOTS ON ABT 10,0 MTS IFO-180  PLUS 2,5 TNS MDO
IN BALLAST RPM 175 - ABT 10,5 KNOTS ON ABT 12,0 MTS IFO-180  PLUS 2,5 TNS MDO

MAX SPEED - RPM 185 ABT 11,0 KNOTS ON ABT 14,0 MTS IFO-180  PLUS 2,5 TNS MDO

2. IN PORT:

GEAR WORKING/NO WORKING  IFO-180 - 9, MDO 2,5 MTS/1.8 MTS

WHEN VSL MANEUVERING OR IN/OUT PORTS OR NAVIGATING IN CONFINED WATERS / CROSSING
CANALS, RIVERS, STRAITS THEN VSLS MAIN ENGINE IS BURNING MDO. SPEED / CONSUMPTION
BASED ON FAIR WEATHER UP 3 AND SEA CONDITION MAXIMUM DOUGLAS SEA STATE 3.

ALL DTLS ABT AND WOG.

EXHIBIT - R 2 (B)

Vessel's Damages during arrest at Dharamtar Anchorage
J Order of Arrest dd. 14/11/2006

| A | Vessel complete discharge | 21.11.2006 |
| 2 | Order of Release dd. | 08.12.2006 |
| 3 | TTL No. of days under arrest | 16 |

Vessel's Running Costs:
Bunker MGO

| ROB on 21.11.06, MT | 49.10 |
| ROB on 08.12.06, MT | 15.20 |
| TTL consmpt | 33.90 |
| MGO cost, US$/MT | 637.00 |
| Cost of Bunker | 21,594.30 |

2  Fresh Water

| ROB on 21.11.06, MT | 92.00 |
| ROB on 08.12.06, MT | 18.00 |
| TTL consmpt | 74.00 |
| Fresh Water cost, US$/MT | 10.00 |
| Cost of Fresh Water | 740.00 |

3  Insurance (P&I, H&M)

| P&I annual premium, US$ | 46,000.00 |
| H&M annual premium, US$ | 17,100.00 |
| Premium per day, US$ | 172.88 |
| TTL premium whilst under arrest | 2,766.03 |

4  Lube Oils

| ROB on 21.11.06, Ltr | 1670 |
| ROB on 08.12.06, Ltr | 1300 |
| TTL consmpt | 370 |
| Lube Oil cost, US$/Ltr | 1.54 |
| Cost of Lube Oils | 569.80 |

| TOTAL DAMAGES | 25,670.13 |

P.S.  due to the variety of lube oils that used for different ship eng nen
calculations made basis on average cost of 1Ltr.
thus, invoice of Freight System comprise delivery of 3 types of lube oils
in drums, whereas average price per drum is AED 1,129 or equivalent to
US$ 308 per drum. Each drum cosist apprx 200Ltr. Therefore, cost of
lube oil is US$ 1.54 per 1Ltr.

TRUE COPY.

Advocate

## AA. EXTRACTS

from DECK LOG BOOK of the mv "BLUE STAR", call signs V4DT, Port of Regist
BASSETERRE, flag – St.Kitts&Nevis, IMO No 7706770:

* Page No 68  The 21st of November, 2006, Tuesday. The port of DHARAMTAR

Fresh water tanks: total 92.0 mts.

* Page No 102. The 08th of December, 2006, Friday. The port of DHARAMTAR.

Fresh water tanks: total 18.0 mts

## BB. EXTRACTS

from ENGINE LOG BOOK of the mv "BLUE STAR", call signs V4DT, Port of Regi
BASSETERRE, flag – St.Kitts&Nevis, IMO No 7706770:

* Page No 93. The 21st of November, 2006, Tuesday. The port of DHARAMTAR.

IFO – 101.0 mts, MGO – 49.1 mts, AE sys.oil – 1670 liters
Signed by Ch engineer.

* Page No 110. The 08th of December, 2006, Friday. The port of DHARAMTAR.

IFO – 101.0 mts, MGO – 15.2 mts, AE sys.oil – 1300 liters.
Signed by Ch Engineer.

Confirm truth of extracts.

Master of m v "BLUE STAR"          M.Romanov

11.01.2007



TRUE COPY

EXHIBIT R2(D)

 

## KHORKALBA MARINE SERVICES
خورکلبا للخدمات البحرية

BUNKERING - WATER SUPPLY - SHIPPING AGENCY
Tel.:+971-6-2774977/2772946, Fax: +971-6-2774800/2777207
Telex:89002 KMSKLB, P.O. Box: 11824, Kalba, Sharjah, U.A.E.
Website: www.khorkalbamarine.com
E-mail: kbms@emirates.net.ae

No: 16767

Date: 26.10.2006

### INVOICE

Mr/ M/s .........        NOVSTAR SHIPPING CO., DUBAI

| Quantity | Description | U. Price | Amount | |
|---|---|---|---|---|
| 200 | M/TONS FRESH WATER SUPPLIED TO M/T BLUE STAR ON 26.10.06 AT KHORFAKKAN ANCHORAGE. | USD 10.00 | USD | 2,000.00 |
| | | | | OR |
| | | | DHS | 7,340.00 |
| DIRHAMS Seven Thousand Three Hundred Forty Only | | | DHS | 7,340.00 |

ACCOUNTS DEPT.                OPERATIONS DEPT.                DIRECTOR

Note: This invoice is due for payment on 24th November 2006.

This is the true copy of document marked as Ext.R referred to in the above Counter Affidavit.

ADVOCATE

EXHIBIT R 2 (E)



**خور كلباء للخدمات البحرية**
## KHORKALBA MARINE SERVICES
Tel: 00971 9 2772848, Fax : 00971 9 2777857, P.O.Box: 11024, Kalba, Shajah, U.A.E.
E-mail: kms@emirates.net.ae
Website: khorkalbamarina.com

No. 5297                    FRESH WATER RECEIPT

Vessel: M.T. BLUE STAR          Port: K-FAKKAN 2ⁿᵈ ANCH

Position 25° 22.8 N  056° 27.6 E  21.5 NM.

Flag:                          Agent: NOVSTAR SHIPPING

Owner:                          Date: OCTOBER 26' 06

| DESCRIPTION | QUANTITY DELIVERED | REMARKS |
|---|---|---|
| | TWO HUNDRED TONS | |
| FRESH WATER | 200 TONS | |

Tender Alongside: 2155   Started Discharge: 2240   Finished Discharge: 0147

RECEIVING MASTER / CH ENGINEER

Signature:

Name in Block Letters: (MASTER)

Ship's Stamp:

Tender: KHAWLA

Master's Signature:

Name in Block Letter:

Tender's Stamp:

This is the true copy of document marked as Ext.R
referred to in the above Counter Affidavit.

ADVOCATE

EXHIBIT R2 (F)

FROM INDUSTER          FAX NO. :00971493049709      Dec. RG 2006 09:30PM     P1
12/05/2006  10:52  2976900              K-ORKALBA MARINE SVS                    PAGE  01

**KHORKALBA** MARINE SERVICES
**خور كلباء للخدمات البحرية**
SHIPPING AGENCY

Attention Accounts Dept.
Fax No : 154-9706909

## NOVSTAR SHIPPING
### STATEMENT OF ACCOUNT
### AS OF 30 NOVEMBER 2006

| Date | Inv No. | Particulars | Vessel Name | Amt Dhs |
|---|---|---|---|---|
| 27.10.2006 | 16752 | Service Boat Hire | Blue Star | 2,000.00 |
| 26.10.2006 | 16767 | Fresh Water Supply | Blue Star | 7,340.00 |
| 27.10.2006 | 16705 | Service Boat Hire | Blue Star | 2,100.00 |
| 26.10.2006 | 16795 | Equipment Hire | Blue Star | 948.00 |
| 26.10.2006 | 16797 | Equipment Hire | Blue Star | 80.00 |
| 29.10.2006 | 16799 | Service Boat Hire | Arabian Star | 1,125.00 |
| 30.10.2006 | 16800 | Service Boat Hire | Blue Star | 1,875.00 |
| 31.10.2006 | 16821 | Other Services | Blue Star | 1,069.00 |
| 27.10.2006 | 16822 | Sign Off Visa | Blue Star | 4,600.00 |
| 26.10.2006 | 16823 | Other Services | Blue Star | 5,295.00 |
| 29.10.2006 | 16824 | Service Boat Hire | Blue Star | 1,625.00 |
| 30.10.2006 | 16828 | Equipment Hire | Blue Star | 444.00 |
| 02.11.2006 | 16844 | Service Boat Hire | Blue Star | 1,995.00 |
| 06.11.2006 | 16874 | Service Boat Hire | Blue Star | 1,900.00 |
| 06.11.2006 | 16876 | Service Boat Hire | Blue Star | 2,000.00 |
| 06.11.2006 | 16894 | Equipment Hire | Blue Star | 410.50 |
| 06.11.2006 | 16926 | Other Services | Blue Star | 435.50 |
| 31.10.2006 | 17124 | Other Services | Blue Star | 5,179.50 |
| | | Total Amount Due To KKMS | | 40,349.00 |

Kindly confirm the figures and arrange payment accordingly.

Thanking you.

Yours sincerely,

For Khorkalba Marine Services
Accounts Dept.

This is the true copy of document marked as Ext.R
referred to in the above Counter Affidavit.

ADVOCATE

TRUE COPY